**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | |
|---|---|
| KATIE ALLEN,<br><br>Plaintiff,<br>v.<br><br>TY MASTERSON, BRAD STARNES, and MEGAN STEELE in their individual capacities,<br><br>Defendants. | **Case No.**<br><br>**JURY TRIAL REQUESTED** |

**COMPLAINT**

Plaintiff Katie Allen, a former employee of the Kansas Department of Education, states her cause of action against Defendants Ty Masterson, Brad Starnes, and Megan Steele, in their individual capacities, as follows:

1. This is an action arising from the online activities of Kansas legislators Ty Masterson, Brad Starnes, and Megan Steele, encouraging that Allen be terminated from her job at the Kanas State Department of Education ("KSDE") in violation of her rights under the First Amendment to the United States Constitution, because of a comment she posted on social media.

2. Allen, while a research analyst for KSDE, came under public criticism for a comment she briefly posted on social media following the shooting of conservative activist Charlie Kirk.

3. Defendants, using their public platforms as Kansas legislators, though not doing legislative work, posted on various social media platforms, criticizing Allen and encouraging members of the public to contact Allen's employer and urge that she be terminated from her employment.

4. Masterson and Starnes posted a joint press release severely criticizing Allen's comments and demanding that she be terminated. Starnes emailed the press release directly to Commissioner of Education Randy Watson and at least one member of the Kansas State Board of Education ("KSBOE").

5. Steele also called for Allen's termination on social media. In addition, she emailed each member of KSBOE calling for Allen to be terminated from her research job at KSDE.

6. In response to the entreaties by Masterson, Starnes, and Steele, a large number of persons called or emailed KSDE demanding that Allen be terminated, and members of KSBOE met with Watson.

7. Masterson also posted Allen's personal cell phone number and encouraged members of the public to call her. Some persons then contacted Allen directly to demand that she resign. Some of those persons also threatened her with death.

8. As a result of the contacts with Watson, KSDE, and KSBOE, Watson terminated Allen's employment.

9. The termination of Allen, an employee of a public agency, for her speech as a private citizen on a matter of public concern, violated the First Amendment.

10. Likewise, Defendants' using their positions as legislators to call for Allen to be terminated violated the First Amendment.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action under 28 U.S.C. § 1331, which provides original jurisdiction in this Court for suits arising under federal law.

12. Venue is proper in the United States District Court for District of Kansas under 28 U.S.C. § 1391(b)(2), because the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

13. At all times relevant to this lawsuit, Plaintiff Katie Allen was a resident of Manhattan, Kansas, and she was serving on the board of Unified School District 383.

14. Defendant Ty Masterson is a Kansas State Senator and is President of the Kansas State Senate, positions he held at all times relevant to this lawsuit.

15. Defendant Brad Starnes is a Kansas State Senator, a position he held at all times relevant to this lawsuit. Starnes represents the district in which Katie Allen resides.

16. Defendant Megan Steele is a member of the Kansas House of Representatives, a position she held at all times relevant to this lawsuit. Steele represents a district that includes Unified School District 383.

17. Plaintiff sues Masterson, Starnes, and Steele in their individual capacities, for actions taken under color of state law.

## FACTUAL BACKGROUND

18. In 2025, Plaintiff Katie Allen was working for KSDE as a research analyst. In that role, she supported an accountability project to bring certain additional services and funds to Kansas public schools. Such additional services and funds may only be obtained based on certain evidence, and it was Allen's job to obtain that evidence.

19. On September 10, 2025, conservative commentator and activist Charlie Kirk was shot during a campus event at Utah Valley University in Orem, Utah, and he died as a result.

20. Charlie Kirk was a polarizing public figure, and comments about his killing, some laudatory of Kirk and some critical of him, quickly proliferated on social media platforms.

21. After Allen left work on September 10, as she was walking to her car, she saw a post on Facebook describing a quote by Charlie Kirk, to the effect that some level of gun violence was inevitable in a society in which numerous citizens owned firearms, and that losses from gun violence were a reasonable price to pay for the Second Amendment right to bear arms.

22. Allen posted a comment on that post, saying, “well deserved.” When she posted that comment, she was unaware that Kirk had died.

23. By the time Allen reached her car, she thought better of her comment, and she deleted it. Her comment remained posted for approximately five to ten minutes.

24. Despite the short time her comment was posted, some persons saw it and spread it on social media.

25. On September 10, 2025, Allen issued an apology for her post, stating, “late this afternoon I was walking to my car and scrolling Facebook” and in “an emotional moment I commented on a post” about the Charlie Kirk shooting. She continued, “I looked back at the post when I got to my car” and “quickly realized I didn’t intend the meaning of the two words I wrote.”

26. Allen continued, “For anyone who was offended by my words, I deeply apologize. That is not who I am or what I believe – which is why I deleted that comment so fast. Like many of you, I am deeply concerned about the violence and discontent happening in America today and will continue to advocate for common sense laws that keep our kids [and] community safe. When I make a mistake, I own it and promise to do better.”

27. On September 11, 2025, Ty Masterson posted on Facebook from “the official page of Kansas Senate President Ty Masterson,” stating, “I urge Education Commissioner Dr.

Watson to immediately remove Allen from her position at the Kansas Department of Education." Masterson posted the same comment on X and Instagram.

28. Masterson is now and was then President of the Kansas Senate. As a public figure, he has a significant following on social media platforms among constituents and other members of the public, and he posted from social media pages identifying him as President of the Kansas Senate.

29. Masterson's social media posts reached a large number of persons and spurred them to encourage that Allen be fired.

30. Masterson and Starnes issued a joint press release on September 11, 2025. The press release's headline stated, "MASTERSON, STARNES CALL FOR KATIE ALLEN'S FIRING AND REMOVAL FOM USD 383 BOARD." The text of the press release stated that Masterson and Starnes "are calling for accountability," and it contained a demand that Allen be fired from her job at KSDE.

31. Masterson posted again on September 12, with a logo saying, "Call to Action." Masterson stated, "Many of you have reached out via email and messages asking how to take action regarding Katie Allen's unacceptable comment celebrating the death of Charlie Kirk. We're calling for her immediate removal from her KSDE Position and her resignation from the USD 383 school board. Allen's actions demand accountability. Here's how you can make your voice heard." Masterson then listed the telephone number of Randy Watson, Education Commissioner, and urged his audience "to demand Katie Allen's removal from the Kansas Department of Education."

32. Masterson also listed Allen's personal cell phone number and encouraged people to call her directly.

33. Many persons shared Masterson's posts on their own social media pages, spreading Masterson's encouragement to people to demand Allen's termination.

34. Masterson has since removed his September 11 and September 12 Facebook posts regarding Allen.

35. Masterson posted again about Allen on September 15, after Watson terminated Allen and before KSDE purported to accept Allen's resignation, essentially taking credit for Allen's termination. Masterson stated, "I took a stand against hate when Katie Allen, a KSDE employee and USD 383 school board member, called Charlie Kirk's murder 'well deserved.' Along with Senator Brad Starnes, we demanded her immediate firing and resignation. . . . Thanks to swift action, she's out at KSDE." Masterson continued, "we're not done," and he then called for her resignation from her position on the USD 383 school board.

36. Starnes posted the press release on his own social media platforms on September 11, and he re-posted Masterson's posts. The press release identified Starnes as a Kansas State Senator.

37. Starnes is now and was then a Kansas State Senator, representing the district in which Allen lives. As a public figure, he has a significant following on social media platforms among constituents and other members of the public.

38. Starnes, identifying himself as a Kansas State Senator, also sent a direct email from his official Kansas Senate email address to various persons, including Education Commissioner Randy Watson and State School Board member Danny Zeck, attaching his press release calling for Allen's firing or resignation and stating, "there must be accountability."

39. Megan Steele posted on Facebook on September 11, 2025, stating "I strongly urge education commissioner Randy Watson to immediately remove Allen from her position . . ..."

She also urged her followers, “Take a stand. Demand she resign.” She also posted the press release Masterson and Starnes issued, with the comment, “I join Senator Starnes and Masterson.”

40. Steele is now and was then a member of the Kansas House of Representatives. As a public figure, she has a significant following on social media platforms among constituents and other members of the public.

41. Steele also wrote emails to each individual member of the Kansas State Board of Education, which hires and has the authority to terminate the Commissioner of Education.

42. In each email to board members, Steele identified herself as “Representative District 51, Kansas House of Representatives.”

43. In her emails to State School Board members, Steele called Allen’s Facebook comment “disgusting and inexcusable” and stated that Allen “has no place working for the State of Kansas or any place near our children’s education.,”

44. Steele then stated to each school board member, “I strongly urge you to immediately demand Allen resign or be fired.”

45. Each school board member received the same email from Steele.

46. One school board member, Cathy Hopkins, responded to Steele, stating, “Thank you for sharing your thoughts, Rep. Steele. Danny [school board member Danny Zeck] and I are speaking with the commissioner about this situation.”

47. School board member Zeck responded to Steele on September 15, stating, “KSDE and Katie have parted ways.”

48. School board member Michelle Dombrosky also sent a return email to Steele on September 15, stating, “Katie Allen is no longer employed by KSDE.”

49. On information and belief, because of the communications he received from the Board of Education, Watson believed he had no choice but to end Allen's employment.

50. In the days following Allen's controversial post and the posts by Masterson, Starnes, and Steele, a large number of persons wrote to Education Commissioner Randy Watson or other persons at KSDE, demanding that Allen either resign or be terminated.

51. Some of the persons who emailed KSDE attached or forwarded the press release issued by Masterson and Starnes.

52. Others mentioned Masterson or Starnes in their emails. For example, in one email from a member of the public to Commissioner Watson, the writer stated, "Senator Masterson brought it to my attention that Katie Allen made disrespectful remarks." The writer requested "that she be forced to resign her position."

53. Another writer said in an email to Watson, "we agree with Mr. Masterson and Mr. Starnes that the safety and moral credibility of Kansas schools are on the line," and stated, "this calls for some type of action associated with the Kansas Department of Education."

54. In addition to persons who directly mentioned the legislators who had posted about Allen's Facebook post, others who demanded that she resign or be fired had "liked" or commented favorably on the social media posts by Masterson, Starnes, and Steele.

55. Allen began to receive phone calls and emails from persons demanding that she resign.

56. Some calls contained actual or veiled threats. One email to her was titled, "resign or die," and the writer promised to "blow your f*****g brains out if you don't resign." She reported these threats to the police. As the calls continued to come in, Allen feared for her personal safety and that of her family. She stopped answering her phone.

57. On the evening of September 11, 2025, in an attempt to ward off death threats and to protect herself and her family, Allen sent an email to the department director Beth Fultz offering her resignation. She received an auto-response from Fultz saying she was out of the office and would return on September 17. Allen continued in her role.

58. On Friday, September 12, Allen received a text from the Human Resources Director saying no one had heard from Allen and asking of she was OK. Allen responded that she was staying home because of threats she had received. There was no mention of Allen's email to Fultz.

59. On Monday, September 15, Allen had a text exchange and a telephone call from the HR Director. Once again, there was no mention of Allen's September 11 email.

60. At 12:04 pm on September 15, 2025, Allen spoke with Commissioner Watson. She apologized for her post and told Watson she was seeking legal counsel to understand her rights. Watson told Allen he had received thousands of letters of complaint, and he had verified that they were all from Kansans. He also said his phone was ringing nonstop, and that he had to do something, and do something quickly. Neither party mentioned Allen's September 11 email.

61. At 2:15 pm on September 15, Allen had another telephone conversation with Watson and a representative of Human Resources. Watson asked Allen whether she would resign. In response, Allen said she would not resign, and she instead proposed a 30-day suspension. Watson denied that option, and again pressured her to resign. Allen stated that she would not resign, and Watson responded that she would need to be separated.

62. On September 16, 2025, the Human Resources Department sent Allen an email regarding details of her separatio9```n, and characterizing her separation as a resignation.

63. Education Commissioner Watson, in addition to believing he had to terminate Allen because of communications from the State School Board, testified in a deposition in Allen's lawsuit against the Commissioner of Education that Allen needed to be separated from KSDE because of the large volume of calls and emails coming in to KSDE following her Facebook post.

**COUNT I**
**VIOLATION OF FIRST AMENDMENT SPEECH RIGHTS—42 U.S.C. § 1983**
**(Defendant Masterson in his individual capacity)**

64. The First Amendment to the U.S. Constitution provides for the right of an individual to have freedom of speech. In particular, public employees speaking as private citizens on matters of public concern are protected by the First Amendment.

65. Allen was a public employee when Masterson called for her termination, and when she was terminated.

66. Allen posted her comment about Charlie Kirk as a private citizen.

67. The topic of Allen's comment, the killing of Charlie Kirk, was an issue of public concern. Kirk's killing and its aftermath was widely covered by news media across Kansas and across the nation, as well as by numerous late-night television hosts. The Vice President of the United States called for persons who post criticism of Kirk to lose their jobs. And the President of the United States ordered that flags be lowered in recognition of Kirk's death.

68. The conduct of Education Commissioner Watson, speaking on behalf of KSDE and under color of state law, and terminating Allen for her controversial comment, violated Allen's First Amendment rights.

69. Masterson's calls for Allen to be terminated for her protected speech likewise violated the First Amendment.

70. The First Amendment applies to Defendant Masterson by virtue of the 14th Amendment.

71. In using his legislative position to pressure a public official to terminate Allen, Masterson acted under color of state law.

72. Masterson's calls on social media for Allen to be terminated and for members of the public to contact KSDE and demand Allen's termination caused Allen's termination. Persons Masterson encouraged to contact KSDE did so, and the resulting pressure on Education Commissioner Watson led to his decision to terminate Allen.

73. Masterson's calls for Allen to be terminated, which were intended to and did provoke members of the public to demand that Watson terminate Allen, were a motivating factor in Allen's termination.

74. Masterson's actions, using his highly visible position as a legislator to call for Allen's termination because of her protected speech, and encouraging members of the public to demand Allen's resignation or termination, would deter a reasonable person from engaging in similar protected speech.

75. Masterson does not enjoy qualified immunity for his decision to violate Allen's First Amendment rights.

76. It has long been clearly established that terminating a public employee because of protected speech made as a private citizen on a matter of public concern violates the First amendment. *Rankin v. McPherson*, 483 U.S. 378, 383 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.").

77. In particular, it is clearly established that terminating a public employee for commenting on an attempted assassination of a public figure violates the First Amendment. In *Rankin*, a public employee commented on the assassination attempt on President Reagan, saying, "if they go for him again, I hope they get him." The Supreme Court held that the public employer's interest in discharging the employee did not outweigh the free speech rights of the employee.

78. It is also clearly established in the Tenth Circuit that a State actor calling for the termination of a public employee because of protected speech may be held liable under Section 1983 for a First Amendment violation, even if someone else is responsible for the decision to terminate the employee. *Wulf v. Wichita*, 882 F.2d 842, 867 (10th Cir. 1989) (the person calling for the employee's termination "should have been on notice that it would be a violation of the First Amendment to terminate" the employee for protected speech, "particularly where the speech caused no significant disruption" of the employer's operations); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused a deprivation of a federal right.").

79. In posting on social media about Allen's protected speech, in calling for Allen's termination, and in encouraging others to call for Allen's termination, Masterson used his legislative position as a public platform, but he was not performing a legislative function.

80. Masterson's conduct in encouraging Allen's termination and encouraging members of the public to contact Allen directly because of her protected speech, resulted in damage to the Allen.

81. In calling for Allen to be terminated in violation of her First Amendment rights, in encouraging members of the public to contact KSDE and demand Allen's termination, and in posting Allen's personal cell phone number and encouraging to call her, resulting in death threats to Allen, Masterson acted with evil motive and intent or with reckless or callous indifference to Allen's First Amendment rights.

WHEREFORE, Plaintiff requests (1) an award of compensation for her economic losses resulting from Masterson's conduct, including loss of salary and benefits that resulted from Allen's termination; (2) an award of other compensatory damages resulting from Masterson's actions; (3) an award of punitive damages for Masterson's conduct that was motivated by the evil motive or intent, or reckless or callous indifference to Allen's constitutionally protected rights; (4) prejudgment and post-judgment interest; (5) an award her taxable costs, non-taxable costs, her expert witness fees, and her costs of litigation, including attorneys' fees pursuant to 42 U.S.C. § 1988; and (6) such other and further relief as the Court may deem just and equitable.

## COUNT II
## VIOLATION OF FIRST AMENDMENT SPEECH RIGHTS—42 U.S.C. § 1983
## (Defendant Starnes in his individual capacity)

82. The First Amendment to the U.S. Constitution provides for the right of an individual to have freedom of speech. In particular, public employees speaking as private citizens on matters of public concern are protected by the First Amendment.

83. Allen was a public employee when Starnes called for her termination, and when she was terminated.

84. Allen posted her comment about Charlie Kirk as a private citizen.

85. The topic of Allen's comment, the killing of Charlie Kirk, was an issue of public concern. Kirk's killing and its aftermath was widely covered by news media across Kansas and

across the nation, as well as by numerous late-night television hosts. The Vice President of the United States called for persons who post criticism of Kirk to lose their jobs. And the President of the United States ordered that flags be lowered in recognition of Kirk's death.

86. The conduct of Education Commissioner Watson, speaking on behalf of KSDE and under color of state law, and terminating Allen for her controversial comment, violated Allen's First Amendment rights.

87. Starnes' calls for Allen to be terminated for her protected speech likewise violated the First Amendment.

88. The First Amendment applies to Defendant Starnes by virtue of the 14th Amendment.

89. In using his legislative position to pressure a public official to terminate Allen, Starnes acted under color of state law.

90. Starnes' calls on social media for Allen to be terminated and his emails to Watson and as least one member of KSBOE demanding Allen's termination caused Allen to be terminated. As a result of Starnes' actions, members of the public and KSBOE contacted Education Commissioner Watson. The resulting pressure on Education Commissioner Watson led to his decision to terminate Allen.

91. Starnes' calls for Allen to be terminated, which were intended to and did provoke members of the public and KSDOE to demand that Watson terminate Allen, were a motivating factor in Allen's termination.

92. Starnes' actions, using his highly visible position as a legislator to call for Allen's termination because of her protected speech, and encouraging members of the public to demand

Allen's resignation or termination, would deter a reasonable person from engaging in similar protected speech.

93. Starnes does not enjoy qualified immunity for his decision to violate Allen's First Amendment rights.

94. It has long been clearly established that terminating a public employee because of protected speech made as a private citizen on a matter of public concern violates the First amendment. *Rankin v. McPherson*, 483 U.S. 378, 383 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.").

95. In particular, it is clearly established that terminating a public employee for commenting on an attempted assassination of a public figure violates the First Amendment. In *Rankin*, a public employee commented on the assassination attempt on President Reagan, saying, "if they go for him again, I hope they get him." The Supreme Court held that the public employer's interest in discharging the employee did not outweigh the free speech rights of the employee.

96. It is also clearly established in the Tenth Circuit that a State actor calling for the termination of a public employee because of protected speech may be held liable under Section 1983 for a First Amendment violation, even if someone else is responsible for the decision to terminate the employee. *Wulf v. Wichita*, 882 F.2d 842, 867 (10th Cir. 1989) (the person calling for the employee's termination "should have been on notice that it would be a violation of the First Amendment to terminate" the employee for protected speech, "particularly where the speech caused no significant disruption" of the employer's operations); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("to establish *personal* liability in a § 1983 action, it is

enough to show that the official, acting under color of state law, caused a deprivation of a federal right.”).

97. In posting on social media about Allen’s protected speech, in calling for Allen’s termination, and in encouraging others to call for Allen’s termination, Starnes used his legislative position as a public platform, but he was not performing a legislative function.

98. Starnes’ conduct in encouraging Allen’s termination because of her protected speech resulted in damage to the Allen.

99. In calling for Allen to be terminated in violation of her First Amendment rights, and in encouraging members of the public and KSBOE to contact KSDE and demand Allen’s termination, Starnes acted with evil motive and intent or with reckless or callous indifference to Allen’s First Amendment rights.

WHEREFORE, Plaintiff requests (1) an award of compensation for her economic losses resulting from Starnes’ conduct, including loss of salary and benefits that resulted from Allen’s termination; (2) an award of other compensatory damages resulting from Starnes’ actions; (3) an award of punitive damages for Starnes’ conduct that was motivated by the evil motive or intent, or reckless or callous indifference to Allen’s constitutionally protected rights; (4) prejudgment and post-judgment interest; (5) an award her taxable costs, non-taxable costs, her expert witness fees, and her costs of litigation, including attorneys’ fees pursuant to 42 U.S.C. § 1988; and (6) such other and further relief as the Court may deem just and equitable.

**COUNT III**
**VIOLATION OF FIRST AMENDMENT SPEECH RIGHTS—42 U.S.C. § 1983**
**(Defendant Steele in her individual capacity)**

100. The First Amendment to the U.S. Constitution provides for the right of an individual to have freedom of speech. In particular, public employees speaking as private citizens on matters of public concern are protected by the First Amendment.

101. Allen was a public employee when Steele called for her termination, and when she was terminated.

102. Allen posted her comment about Charlie Kirk as a private citizen.

103. The topic of Allen's comment, the killing of Charlie Kirk, was an issue of public concern. Kirk's killing and its aftermath was widely covered by news media across Kansas and across the nation, as well as by numerous late-night television hosts. The Vice President of the United States called for persons who post criticism of Kirk to lose their jobs. And the President of the United States ordered that flags be lowered in recognition of Kirk's death.

104. The conduct of Education Commissioner Watson, speaking on behalf of KSDE and under color of state law, and terminating Allen for her controversial comment, violated Allen's First Amendment rights.

105. Steele's calls for Allen to be terminated for her protected speech likewise violated the First Amendment.

106. The First Amendment applies to Defendant Steele by virtue of the 14th Amendment.

107. In using her legislative position to pressure a public official to terminate Allen, Steele acted under color of state law.

108. Steele's calls on social media for Allen to be terminated and her emails to all the members of KSBOE demanding Allen's termination caused Allen to be terminated. As a result of Steele's actions, members of the public and KSBOE contacted Education Commissioner Watson. The resulting pressure on Education Commissioner Watson led to his decision to terminate Allen.

109. Steele's calls for Allen to be terminated, which were intended to and did provoke members of the public and KSBOE to demand that Watson terminate Allen, were a motivating factor in Allen's termination.

110. Steele's actions, using her highly visible position as a legislator to call for Allen's termination because of her protected speech, and encouraging members of the public and KSBOE to demand Allen's resignation or termination, would deter a reasonable person from engaging in similar protected speech.

111. Steele does not enjoy qualified immunity for her decision to violate Allen's First Amendment rights.

112. It has long been clearly established that terminating a public employee because of protected speech made as a private citizen on a matter of public concern violates the First amendment. *Rankin v. McPherson*, 483 U.S. 378, 383 (1987) ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.").

113. In particular, it is clearly established that terminating a public employee for commenting on an attempted assassination of a public figure violates the First Amendment. In *Rankin*, a public employee commented on the assassination attempt on President Reagan, saying, "if they go for him again, I hope they get him." The Supreme Court held that the public

employer's interest in discharging the employee did not outweigh the free speech rights of the employee.

114. It is also clearly established in the Tenth Circuit that a State actor calling for the termination of a public employee because of protected speech may be held liable under Section 1983 for a First Amendment violation, even if someone else is responsible for the decision to terminate the employee. *Wulf v. Wichita*, 882 F.2d 842, 867 (10th Cir. 1989) (the person calling for the employee's termination "should have been on notice that it would be a violation of the First Amendment to terminate" the employee for protected speech, "particularly where the speech caused no significant disruption" of the employer's operations); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused a deprivation of a federal right.").

115. In posting on social media about Allen's protected speech, in calling for Allen's termination, and in encouraging others, including members of KSBOE, to call for Allen's termination, Steele used her legislative position as a public platform, but she was not performing a legislative function.

116. Steele's conduct in encouraging Allen's termination because of her protected speech resulted in damage to the Allen.

117. In calling for Allen to be terminated in violation of her First Amendment rights, and in encouraging members of the public and KSBOE to contact KSDE and demand Allen's termination, Steele acted with evil motive and intent or with reckless or callous indifference to Allen's First Amendment rights.

WHEREFORE, Plaintiff requests (1) an award of compensation for her economic losses resulting from Steele's conduct, including loss of salary and benefits that resulted from Allen's termination; (2) an award of other compensatory damages resulting from Steele's actions; (3) an award of punitive damages for Steele's conduct that was motivated by the evil motive or intent, or reckless or callous indifference to Allen's constitutionally protected rights; (4) prejudgment and post-judgment interest; (5) an award her taxable costs, non-taxable costs, her expert witness fees, and her costs of litigation, including attorneys' fees pursuant to 42 U.S.C. § 1988; and (6) such other and further relief as the Court may deem just and equitable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Topeka, Kansas as the place of trial of this matter.

## JURY DEMAND

Plaintiff requests a jury trial on all issues so triable pursuant to the Seventh Amendment of the United States Constitution and to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

**DUGAN SCHLOZMAN LLC**

/s/ *Mark V. Dugan*

Heather J. Schlozman, KS Bar # 23869
Mark V. Dugan, KS Bar # 23897
heathis@duganschlozman.com
mark@duganschlozman.com
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
Telephone: (913) 322-3528
Facsimile: (913) 904-0213

**Counsel for Plaintiff**